IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

In re LATTICE SEMICONDUCTOR        )   Case No. CV04-1255-AA
CORPORATION SECURITIES            )   (Consolidated Cases)
LITIGATION                        )
                                  )       OPINION AND ORDER
                                  )
_____   )
                                  )

Dennis J. Herman
Lerach Coughlin Stoia Geller Rudman & Robbins
100 Pine Street, Suite 2600
San Francisco, California 94111

Tamara J. Driscoll
Lerach Coughlin Stoia Geller Rudman & Robbins
1700 Seventh Avenue, Suite 2260
Seattle, Washington 98101

William S. Lerach
Darren J. Robins
Lerach Coughlin Stoia Geller Rudman & Robbins
401 B Street, Suite 1600
San Diego, California 97201

Elise Cohen
Lerach Coughlin Stoia Geller Rudman & Robbins

1   - OPINION AND ORDER

9601 Wilshire Blvd., Suite 510
Beverly Hills, California 90210
      Lead Counsel for Plaintiffs

Gary Grenley
David Dean
Paul Trinchero
Grenley, Rotenberg, Evans, Bragg & Bodie
1211 S.W. Fifth Avenue, Suite 1100
Portland, Oregon 97204
      Liaison Counsel

Lois Rosenbaum
Stoel Rives
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204
      Attorney for defendants Lattice Semiconductor
Corporation, Stephen A. Skaggs, and Steven A. Laub

Richard L. Baum
Perkins Coie
1120 N.W. Couch Street
Portland, Oregon 97209

Darryl P. Rains
Paul H. Goldstein
Morrison & Foerster
755 Page Mill Road
Palo Alto, California  97304
      Attorneys for defendant Cyrus Tsui

Frank J. Weiss
Tonkon Torp
888 S.W. Fifth Avenue, Suite 1600

David Siegel
Martin N. Gelfand
Garland Kelley
Irell & Manella
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
      Attorneys for defendant Ronald L. Hoyt


AIKEN, District Judge:

      This is the consolidation of three class actions filed

against Lattice Semiconductor Corporation (Lattice); its Chief Executive Officer, Cyrus Tsui; its Chief Financial Officer, Stephen A. Skaggs; its former Chief Operating Officer and President, Steven A. Laub; and its former Controller, Ronald Hoyt. Plaintiffs assert claims for violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), (the Act), and Rule 10b-5, 17 C.F.R. § 240.10-5, promulgated under the Act. Defendants Lattice, Tsui, Skaggs and Laub have filed a joint motion to dismiss the Consolidated Complaint ("the joint motion"). The joint motion is premised on the argument that plaintiffs' *scienter* allegations fail to raise a strong inference that defendants acted deliberately or with reckless indifference.

Defendant Hoyt has filed a separate motion to dismiss the Consolidated Complaint. His motion is based on the contention that plaintiffs have not stated a § 10(b) claim against him and, because the § 20(a) claim is a derivative one which can only arise from a violation of § 10(b) or Rule 10b-5, the § 20(a) must necessarily fail.

### Factual Background

Plaintiffs are a class of investors who purchased Lattice stock between April 2003 and April 2004 (the Class Period). They allege that Lattice reported false financial results for the first three quarters of 2003, thereby misleading investors about

Lattice's financial performance and the demand for its products and artificially inflating the price of the stock. The conduct alleged against Lattice is that it manipulated its financial statements by prematurely recognizing revenues on products that had been shipped to distributors but never sold to end users. The recognition of these revenues was improper under Generally Accepted Accounting Principles (GAAP) and contrary to Lattice's publicly stated revenue recognition policies, because the products sold to distributors were subject to rights of return and price protection agreements. Rather than being recognized as revenue, the products shipped to distributors but still unsold should have been reported as deferred income.

On January 22, 2004, Lattice announced publicly that it would delay reporting its 4Q03 results because of the "possible overstatement" of revenues. On March 18, 2004, Lattice announced an anticipated restatement of its first, second and third quarter 2003 financial statements, to reduce revenues and earnings and increase its deferred income balances.

The restatement was issued on March 24, 2004. The March 2004 restatement indicated that Lattice's revenues had been over-reported by $10.6 million as a result of the premature revenue recognition, and that its earnings per share (EPS) had been overstated. On April 1, 2004, Lattice filed its results for the fourth quarter and its FY03 financial statements. On April 19,

2004, Lattice filed amended quarterly reports on Forms 10-Q/A for the first, second and third quarters of 2003.

## Plaintiffs' Allegations

The 95-page Consolidated Complaint (Complaint) alleges the following facts.

### General state of Lattice's business in FY03

Lattice designs, develops and markets programmable logic devices (PLDs) and related software. Complaint, ¶ 2. PLDs are semiconductor components that can be configured by end users as specific logic circuits. Id. Lattice sells three main types of products: Complex PLDs (CPLDs), Simple PLDs (SPLDs) and Field Programmable Gate Arrays (FPGAs). Id. These three product lines are used primarily by original equipment manufacturers (OEMs) in the communications, computing, industrial, automotive, medical, consumer and military end markets. Id. OEMs purchase products directly from Lattice or from Lattice's distributors or manufacturers' representatives. Id.

Lattice is one of four companies comprising approximately 98% of the market for PLDs. Complaint, ¶ 25. Before and during the Class Period, semiconductor manufacturers Xilinx, Inc. and Altera Corporation were the market leaders, while Lattice and Actel Corporation occupied smaller segments of the market. Id.

Lattice's core products are in the CPLD segment. Complaint, ¶ 26. During 2003, about 89% of Lattice's revenue was derived

from PLD products-- 69% from CPLDs and 13% from SPLDs. Products derived from FPGA products accounted for 18% of Lattice's sales. Id.

Lattice sought to increase its market share through acquisitions of competitors, including Vantis Corporation in 1999 and Agere Systems' PLD division in 2001. Complaint, ¶ 27. The Vantis and Agere acquisitions were expected to provide Lattice with entry into the FPGA market and to help grow sales of its core CPLD and SPLD products. Id.

In the years after Lattice's acquisitions of Vantis and Agere, Lattice's research and development (R & D) costs doubled, exceeding $85 million in FY02. Lattice's R & D costs were substantially higher than Lattice's competitors on a percentage basis, largely because of Lattice's efforts to build a competitive FPGA product, as well as the cost of supporting the many different products which it had inherited from the two acquisitions, Vantis and Agere. Id. By 2Q03, Lattice's R & D expenses were over 35% of total sales. Id. To bring its R & D spending to the 12-15% Lattice had averaged in the past, Lattice would have had to more than double its revenue. Id.

While the acquisition of Vantis and Agere had initially raised Lattice's revenues, by 2002, they had fallen back to their pre-acquisition levels. Complaint, ¶ 28. The reduction was partially explained by a general fall-off in the PLD industry,

which declined by 36% over 2001-02. Lattice's market share had declined from 23% in 1999 to 8% in 2003, the steepest decline of any of the four primary competitors in the industry. Id. Declining sales and loss of market share had caused Lattice's stock price to fall from a high of $27.16, on May 21, 2001, to $8.83 by the beginning of 2003. Complaint, ¶ 29. Meanwhile, the acquisition of Vantis and Agere had cut Lattice's working capital in half and, as noted, doubled its R & D expenditures. Id. The drop in the stock prices placed almost all of the stock options Lattice had issued to its employees, including the defendants, deep underwater.[1] Id.

Lattice found itself unable to compete successfully in the FPGA market. FPGAs account for 75% of the PLD market; CPLDs represent 22% and SPLDs account for the rest. Lattice's inability to penetrate the FPGA segment of the market was demonstrated by the fact that, in 2003, new products accounted for only 12% of Lattice's sales, compared with 32% and 42% for its more successful competitors, Xilinx and Altera. Complaint, ¶ 32. Throughout 2003, new product developments by its competitors made substantial inroads into Lattice's core CPLD and SPLD product lines. Lattice's sales of SPLD products, which accounted for about 15% of its revenue, fell off dramatically as Lattice's

---

[1] That is, the price at which the stock options could be exercised by the employees was higher than the price of purchasing the stock over the counter.

rivals introduced higher performance, lower priced products. In fact, during 2003, SPLDs became generally obsolete as pricing and performance enhancements allowed CPLDs to compete for the same "socket" with higher performance and lower prices. Sales of Lattice's CPLD business also lost ground to Altera and Xilinx. Complaint, ¶ 33.

The Complaint alleges that according to Confidential Witness (CW) 5, a manufacturers' representative who sold Lattice products during the Class Period, Lattice could never compete successfully with FPGA products offered by Xilinx because Lattice was too late getting into the FPGA market. Complaint, ¶ 34.

According to CW 6, who also sold Lattice FPGA products during the Class Period, customers were more likely to buy Xilinx FPGA products because Xilinx provided superior software. Id. According to CW 7, who helped manage Lattice's internal website during the Class Period, software problems caused Lattice repeatedly to miss projected launch dates for new products, further delaying its ability to penetrate the FPGA market. Id.

The falling sales of CPLD and SPLD products triggered the price protection and return guarantees provided in Lattice's agreements with its distributors. Complaint, ¶ 35. According to the Complaint, Lattice's sales of new products had been more than offset by sharply lowered demand and declining prices for its core CPLD and SPLD products. Id.

By 3Q03, Lattice's sales had fallen by 12%; Lattice was still the only PLD supplier to experience declining sales. Complaint, ¶ 36. Lattice was the only PLD vendor which had not regained revenue levels achieved in 2001, before the general fall-off in the PLD industry during 2001-02. Id.

By the beginning of the Class Period, Altera and Xilinx controlled 84% of the programmable logic market, leaving Lattice and Actel to compete for the rest. Lattice captured 8% of the market in 2003, a decline from 10% in 2002, and Actel captured 6%. Complaint, ¶ 31.

Plaintiffs allege that, to maintain the appearance of profitability in the face of these setbacks, Lattice recognized revenue on products that had been shipped to distributors but not sold to end users–– products that were subject to being sold at discounted prices or even returned for full refunds. *See, e.g.,* Complaint, ¶ 45. Moreover, according to CW 2, a former Lattice regional sales manager, during FY03, Lattice's distributors had been encouraged to purchase more inventory than usual––a practice that CW 2 said would have had to be approved by Tsui, Laub or other top Lattice management. Id. CW 2 has said that Lattice then refused to accept returns of excess inventory from these same customers and distributors. Id.

The Complaint alleges that according to CW 8, a former manager in Lattice's finance department before and during the

Class Period, if information came into the finance department that did not follow an expected trend, this information would be adjusted to "stay with the trend." Complaint, ¶ 39. For example, CW 8 has said that if negative sales information was reported, it would be attributed to faulty information systems and Lattice would fall back on reporting trends and adjust the information to what it had expected to see, rather than what had actually been reported. Id.

<u>Statements made by Lattice in 1Q03</u>

On April 22, 2003, Lattice issued a news release reporting its 1Q03 financial results. Complaint, ¶ 51. The press release stated that revenue for the quarter had increased one percent from the previous quarter's revenue, down one percent from the revenue reported in the same quarter a year ago. Id. The April 22, 2003 press release also stated that quarterly revenue from high density CPLD products had increased 4% from the previous quarter, while quarterly revenue from FPGA products had decreased 9% from the previous quarter. Id. Tsui was quoted in the April 22 press release as saying, "We are pleased to report sequential revenue growth ... in our ... operating income for the second consecutive quarter. Our CPLD revenue grew nicely and our results reflect the broad leadership position of our innovative product portfolio." Id.

Lattice stated that its business outlook for the second

quarter of 2003 was that revenues would be essentially flat, gross margins would remain at approximately 60% of revenue, and operating expenses were expected to be essentially flat. Id. Tsui was also quoted as saying, "Despite the sequential decline in our FPGA revenue, we remain confident about ongoing customer design activity and future prospects for our advanced FPSC products and our innovative XP products." Complaint, ¶ 72.

Plaintiffs allege that these statements were false when made because Lattice was losing market share to its competitors, and was not experiencing growth from its new FPGA or CPLD products. Complaint, ¶ 73.

The April 22, 2003 news release was followed by an investor conference call the same day (the 1Q03 Conference Call), hosted by Tsui, Laub, Skaggs and Rodney Sloss, the Vice President of Finance. Complaint, ¶ 53. They repeated the financial results given in the news release. Skaggs falsely stated that Lattice did not report revenue of distribution sales until the actual product was sold off the shelves of the distributors. Id. During the Conference Call, Laub told investors they should look at Lattice's gross margin as a sign of its ability to compete with Xilinx:

> The fact is that Lattice has demonstrated a higher
> gross margin over the last couple of years than
> Xilinx, ... much more consistent gross margin. At the
> same time doing so without writing down any of our
> inventory like they have demonstrated. When it comes

to demonstrating cost competitiveness, I think the
best way to judge that is through the financials.

Complaint, ¶ 65. Laub also told investors that Lattice expected
that "with a lot of new products we've introduced now over the
last ... 12 to 18 months, ...these really should give us a lot of
support for growth in the second half of this year and for 2004."
Complaint, ¶ 69. Laub told the investors they should "expect that
CPLD will see some growth" in sales during the second quarter,
and that Lattice was "quite bullish" about its FPGA revenues."
Complaint, ¶ 71.

On May 12, 2003, Lattice filed its Form 10-Q for 1Q03. The
Form 10-Q was signed by Skaggs, and included the false
information contained in the 1Q03 financial statements. The Form
10-Q reported that gross margin as a percentage of revenue was
60.2% in the first quarter of 2003, a slight improvement as
compared to 59.9% for the first quarter of 2002. Complaint, ¶ 63.
Lattice attributed this improvement to reductions in its overall
manufacturing costs. Id.

The Form 10-Q also contained certifications required by the
Sarbanes-Oxley Act, signed by Tsui and Skaggs, which stated, in
part:

- That the report did not "contain any untrue
  statement of a material fact or omit to state a
  material fact necessary to make the statements made,
  in light of the circumstances under which such
  statements were made, not misleading." Complaint, ¶
  56.

● That based on their knowledge, "the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant..." Id.

● That Tsui and Skaggs were "responsible for establishing and maintaining disclosure controls and procedures" and that they had "designed such disclosure controls and procedures to ensure that material information relating to [Lattice] including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared." Id.

● That the information contained in the quarterly report "fairly presents, in all material respects, the financial condition and results of operations of Lattice Semiconductor Corporation." Id.

The April 22, 2003 press release, the 1Q03 Conference Call transcript, and the 1Q03 report on Form 10-Q were published on Lattice's website, for review and downloading by investors. Complaint, ¶ 57.

<u>Statements made by Lattice in 2Q03</u>

On July 21, 2003, Lattice issued a press release reporting its 2Q03 financial results. The press release stated that revenue for the quarter was $58.2 million, flat with the previous quarter's revenue and an increase of three percent from the same quarter in 2002. Complaint, ¶ 75. Net loss was reported to be $16.9 million (15 cents per share). Id. The press release stated that gross margins were expected to remain at approximately 60% of revenue, and that total operating expenses were expected to

decrease by about $1-2 million. Id. In the press release, Tsui stated that since 2002, Lattice had brought to market five new major product families: advanced field programmable system chips (FPSC), ispXP products, ispPAC POWR devices, ispMACH 4000Z CPLDs and BFW III CPLDs. He said,

> While the collective revenue of these new products is still relatively small, it grew very rapidly on a sequential basis. In addition, these new products accounted for well over a third of our customer design activity last quarter. We believe this positive customer reception will drive continued growth for these products.

Complaint, ¶ 89.

An investor conference was held on July 22, 2003 (the 2Q03 Conference Call), at which Tsui, Laub and Skaggs repeated Lattice's 2Q03 financial results and the projected results for 2Q03. Complaint, ¶ 77. Skaggs said that "inventory on the distributor shelf is also lower. In fact, inventory from the distributors in the channel is well below two months." Complaint, ¶ 78.

Laub stated that Lattice's new products were "generating lots of enthusiasm from the customer base, as they are setting records for new designs wins." Complaint, ¶ 90. He also stated that "In the CPLD area, we expect to continue to grow our business in the low voltage CPLD part of the marketplace. ... Furthermore, we're encouraged by the strong design activity of our other new product families and are confident of the revenue

ramp of the products." Id.

On August 8, 2003, Lattice filed its 2Q03 report on Form
10-Q for 2Q03. Complaint, ¶ 80. Lattice stated that the

> slight revenue increase in the second quarter and
> first six months of 2003 as compared to the second
> quarter and first six months of 2002 was primarily
> due to revenue from the sale of new products.
> Nonetheless, overall revenue levels for all periods
> presented remain substantially depressed from earlier
> periods and reflect the continued downturn and
> resultant overall decrease in demand for our
> products.

Complaint, ¶ 85. The report was signed by Skaggs, and included
the 2Q03 financial statements and Sarbanes-Oxley certifications
identical to those attached to the 1Q03 Form 10-Q. Id. The July
21, 2003 press release, the 2Q03 Conference Call transcript, and
the 2Q03 report on Form 10-Q were published on Lattice's website.
Complaint, ¶ 81.

### Statements made by Lattice in 3Q03

On October 20, 2003, Lattice issued a press release
reporting its 3Q03 financial results. Complaint, ¶ 97. The press
release stated, in part, that revenue was down 12% from the $58.2
million reported the previous quarter, and down 9% from the $56.1
million reported in the same quarter a year ago. The press
release also stated that quarterly revenue from FPGA products had
increased 3% from the previous quarter, while revenue from high
density CPLD products was down 14% from the previous quarter. The
press release also stated that new product revenue growth was

41%, accounting for 12% of total quarterly revenue. Lattice reported a net loss for the quarter of $21.9 million (20 cents per share).

On October 21, Lattice held an investor conference call, hosted by Laub and Skaggs (3Q03 Conference Call). Complaint, ¶ 99. Lattice's 3Q03 financial results were repeated there. In the 3Q03 Conference Call, Lattice assured analysts and investors that Lattice had experienced 20% growth in its FPGA product line, Complaint, ¶ 112, and that the company was making excellent progress in growing its new products. Id.

On November 12, 2003, Lattice filed its Form 10-Q for 3Q03. The Form 10-Q included the false information contained in Lattice's 3Q03 financial statements and the same Sarbanes-Oxley certifications. Complaint, ¶ 100. On the Form 10-Q, Lattice stated that the steeper revenue decline in the third quarter "reflects a continued softening in demand and declining average selling prices for our SPLD and certain CPLD products, which more than offset increased revenue from sales of our FPGA and new CPLD products." Complaint, ¶ 105. Lattice attributed the decrease in deferred income to "lower shipments and billings to the distributors, resulting in lower inventories at the distributors." Complaint, ¶ 106. The information was published on Lattice's website. Complaint, ¶ 101.

On November 13, 2003, Lattice told investors that it was on

track to meet 4Q03 earnings projections. Complaint, ¶ 111. On December 11, 2003, Lattice told analysts to expect increased 4Q03 revenues, which caused analysts to raise their ratings on Lattice. Id. But when 4Q03 earnings were released, Lattice announced a quarterly loss of four cents per share.

### Delays in release of 4Q03 and FY03 financial results

On January 22, 2004, Lattice issued a press release announcing a delay in the release of its 4Q03 and FY03 financial results until February 2004, and saying management had learned of a possible overstatment of the company's deferred income account. Complaint, ¶ 117. A March 1, 2004 press release announced a further delay in Lattice's financial results, until March 18, 2004, Complaint, ¶ 119, but also stated that its revenues were expected to grow 6-10% in 1Q04. Complaint, ¶ 120. On March 18, 2004, Lattice delayed its financial results again, announcing that it would restate all quarterly results reported in 2003 to reduce reported revenues by $10 million to $11 million. Complaint, ¶ 121.

### Discovery of accounting improprieties

According to the Complaint, accounting fraud was uncovered after Lattice's outside auditors, PricewaterhouseCoopers (PWC) began reviewing Lattice's books in preparation for its 2003 year-end audit. Complaint,¶ 11. PWC's discovery triggered Lattice's announcement of a possible overstatement of its deferred income

account on January 22, 2004, and an investigation. <u>Id.</u>

On March 1, 2004, Lattice announced that its investigation was still incomplete. Complaint, ¶ 12. On March 18, 2004, Lattice admitted that its 1Q03, 2Q03, and 3Q03 results were false when issued. <u>Id.</u> Plaintiffs allege that Lattice stock price drops in January and March 2004 "confirm that Lattice's stock traded at artificially inflated prices during the Class Period... ." <u>Id.</u>

<u>The March 2004 restatement</u>

On March 24, 2004, Lattice announced to the press that it had completed review of its deferred income accounting; was restating its financial results because of "inappropriate accounting entries made by an individual in the Company's finance department and deficiencies in the design and operation of internal accounting controls related to the deferred income account;" and that it would be filing amended Form 10-Q reports for the first, second and third quarters of 2003 and reporting revised financial results for 4Q03 and FY 03. Complaint, ¶ 124.

For 3Q03, the restatement reduced revenue by $8 million; reduced cost of sales by $1.2 million; increased net loss from 20 cents per share to 26 cents per share; increased deferred income by $3.4 million; increased accounts payable and other accrued liabilities by $5.5 million; and reduced reported retained earnings account by $8.9 million. <u>Id.</u>

For 2Q03, the restatement reduced revenue by $1.6 million;

reduced cost of sales by $0.3 million; increased net loss by $1.3 million; increased deferred income balance by $0.8 million; increased accounts payable and other accrued liabilities by $1.3 million; and reduced reported retained earnings by $2.1 million. Id.

For 1Q03, the restatement reduced revenue by $1 million; reduced cost of sales by $0.2 million; increased net loss from 17 cents per share to 18 cents per share; increased the deferred income balance by $0.9 million; and reduced the reported retained earnings by $0.8 million. Id.

On March 24, 2004, during a conference call for analysts and investors, Skaggs acknowledged that Lattice's deferred income account fell below the level that was required to support the inventory on its distributors' shelves throughout 2003. Complaint, ¶ 125. Skaggs attributed this to a "small error in the estimate we use to calculate revenue from distributors retail reports." Id. He said that although the estimate had turned out, in retrospect, to be "slightly off" for 2003, it was "consistent with the estimates we used historically." Skaggs reported that during January 2004, senior management was "made aware by an individual in our finance department of inappropriate accounting entries he made during the June and September quarters to restore the deferred income account by offsetting accrued expenses to the balance that was originally reported for those quarters." Id.

Skaggs said, "Had management been aware of the situation in a contemporaneous manner, rather than making the offsetting entries to accrued expense, we would have recorded a change in accounting estimate and restored the deferred income to a proper balance." Id. Plaintiffs allege that during this conference call, Skaggs "continued to hide the extent to which Lattice had been using its deferred income to manage its gross margins, by deflecting analysts' questions regarding the disparity between restated revenues and costs." Complaint, ¶ 127.

Falsity of financial statements in 1Q03, 2Q03, and 3Q03

Defendants have admitted that each of the quarterly financial statements published by Lattice during the Class Period contained false information about the amount of revenues it had earned, the amount of unsold product on distributors' shelves (as reflected in the deferred income account balance), gross margins, liabilities, and EPS. Complaint, ¶ 40.

Paragraphs 59, 83, and 103 of the Complaint contain charts identifying financial information as it was initially reported-- revenue amounts, gross margins, accounts payable and accrued expenses, deferred income, net loss, and net loss per share diluted-- and as reflected in the restatements.

In its Form 10-Q/A, for 2Q03, Lattice admitted that its claim of revenue growth from new product sales was false: "The revenue decrease in the first six months of 2003 as compared to

the first six months of 2002 reflects this continued downturn, with the decline in overall demand more than offsetting increased revenue from the sale of all new products." Complaint, ¶ 86. Form 10-Q/A for 3Q03 made a similar admission:

> The steeper revenue decline in the third quarter reflects sales allowances and price protection credited to distributors during the quarter and to a lesser extent a continued softening in demand and declining average selling prices for our SPLD and certain CPLD products, which more than offset increased revenue from sales of our FPGA and new CPLD products."

Complaint, ¶ 105.

In its report on Form 10-K for FY 03, Lattice admitted that the financial results reported in the first, second and third quarters of 2003 were false because revenues were improperly recognized before products had been resold by distributors to end users, and because Lattice had failed to adhere to its stated accounting policies. Complaint, ¶¶ 60, 84, 104.

## Hoyt's involvement in overstatement of revenues

The Complaint alleges that defendants have admitted the "restatement resulted from inappropriate accounting entries made by an individual in the Company's finance department." Complaint, ¶ 124. This individual was defendant Hoyt. The Complaint alleges that according to Skaggs, Hoyt made the improper journal entries in order to change the amounts that were originally reported and restore the deferred income account to desired levels. Complaint,

¶ 125. According to Skaggs, Hoyt did this by "offsetting accrued expenses to the balance that was originally reported for those quarters." Id. This resulted in Lattice's under-reporting its accrued expenses by $1.3 million in 2Q03 and by $5.6 million in 3Q03. See Complaint, ¶¶ 106, 129. Plaintiffs allege that this under-reporting of accrued expenses enabled Lattice to artificially inflate its revenues and claim that it was maintaining its 60% gross margin, even though its CPLD products were becoming obsolete and its new FPGA products had not penetrated the market. See Complaint, ¶¶ 2, 40, 51, 75, 103, 126.

CW 8, who worked with Hoyt as a manager in Lattice's finance department for five years, including the entire Class Period, has allegedly said that Hoyt had made the journal entries that led to the restatement and then resigned as a result. Complaint, ¶ 48. According to CW 1, CW 7, and CW 8, Lattice immediately rehired Hoyt as a consultant. Id.

The Complaint alleges that Hoyt had an excellent relationship with upper management and felt "free to speak his mind," but also that he was a "yes man" who was extremely intimidated by Tsui and who would have done whatever Tsui told him to, in order to keep his job. Complaint, ¶ 49. CW 1 states that he found it "very hard to believe" Hoyt's journal entries were not being reviewed by upper management, and he did not believe Hoyt was the type who would intentionally input wrong

numbers "without a nudge" from someone in senior management. Id. According to CW 7, Hoyt could do nothing without the approval of Tsui or Skaggs. Id.

### "Hands on" management style of upper executives

Plaintiffs allege that CW 2, a former Lattice sales manager, has said that Lattice was operated as a reflection of Tsui's personality, whom he characterized as a "dictator." Complaint, ¶ 186. CW 1, who worked in Lattice's finance department, has also characterized Tsui as an "overbearing, domineering, power hungry micromanager" who maintained living quarters in Lattice's building. Id. CW 8 also characterizes Tsui as a "micromanager." Id. CW 1 has said that Tsui involved himself in minute details of Lattice's operations, including reviewing and approving hiring decisions for even extremely low level employees. Id. CW 7 has also described Tsui as "controlling." CW 7 has said that all decisions at Lattice went through top management, and nothing would be approved without the input or direct supervision of Tsui. Id.

## Standards

A motion under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Edwards v. Marin Park, Inc., 356 F.3d 1058, 1061 (9th Cir. 2004).

Section 10(b) of the Act, 15 U.S.C. § 78j(b), makes it unlawful "for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" SEC Rule 10b-5, promulgated under the authority of § 10(b), provides:

> It shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Under § 20(a) of the Act, controlling persons who aid and abet violations of the Act are jointly and severally liable for the acts of the violator, absent a finding of good faith and lack of inducement. No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003)(America West).

To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege: 1) a misstatement or omission 2) of material fact 3) made with *scienter* 4) in connection with the purchase or sale of a security, 5) on which plaintiffs relied, and 6) which proximately caused them economic loss. *See* Dura Pharms., Inc. v.

<u>Broudo</u>, 544 U.S. ___, 125 S.Ct. 1627, 1631 (2005); <u>McCormick v.</u>
<u>Fund American Companies, Inc.</u>, 26 F.3d 869, 875 (9th Cir. 1994).

To prove a prima facie case under § 20(a) of the Act, 15
U.S.C. § 78t(a), plaintiff must establish 1) a primary violation
of federal securities law and 2) that the defendant exercised
actual power or control over the primary violator. <u>America West</u>,
320 F.3d at 945.

The Private Securities Litigation Reform Act (PSLRA)
amended the Act to heighten the pleading requirements for private
securities fraud litigation by requiring that a complaint plead
with particularity both falsity and *scienter*. 15 U.S.C. § 78u-
4(b)(1), (b)(2); <u>Ronconi v. Larkin</u>, 253 F.3d 423, 429 (9th Cir.
1999).[2]

The *scienter* requirement is satisfied when the complaint
alleges that the defendants made false or misleading statements
either intentionally or with deliberate recklessness. 15 U.S.C.
§ 78u-4(b)(2); <u>In re Daou Systems, Inc.</u>, 411 F.3d 1006, 1014-15
(9th Cir. 2005). Recklessness is

> a highly unreasonable omission, involving not merely
> simple, or even inexcusable negligence, but an
> extreme departure from the standards of ordinary
> care, and which presents a danger of misleading

---

[2] Before passage of the PSLRA, pleading requirements in
private securities fraud litigation were governed by Rule 9(b) of
the Federal Rules of Civil Litigation, which required only that
"falsity" be pleaded with particularity; *scienter* could be pleaded
generally. <u>Id.</u> at n. 6.

> buyers or sellers that is either known to the
> defendant or is so obvious that the actor must have
> been aware of it.

<u>DSAM Global Value Fund v. Altris Software, Inc.</u>, 288 F.3d 385, 389 (9th Cir. 2002). To allege a strong inference of deliberate recklessness, plaintiffs must state "facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." <u>Id.</u> *See also* <u>In re Silicon Graphics, Inc. Sec. Litig.</u>, 183 F.3d 970, 977 (9th Cir. 1999)(recklessness satisfies *scienter* under § 10(b) to extent it reflects "some degree of intentional or conscious misconduct.")

To meet the pleading requirements for *scienter* imposed by the PSLRA, plaintiff must allege, "in great detail," facts that constitute "strong circumstantial evidence of deliberately reckless or conscious misconduct." <u>Id</u>. at 974; 15 U.S.C. § 78u-4(b)(2) (complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). In considering whether a strong inference of *scienter* has been pleaded, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs. <u>Daou</u>, 411 F.3d at 1022; <u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 897 (9th Cir. 2002). However, as the court noted in <u>In re Read-Rite Corp.</u>, 335 F.3d 843, 846 (9th Cir. 2003), "falsity and scienter are generally inferred from the same set of facts."

The complaint is to be analyzed in its entirety, as "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." <u>Bourjaily v. United States</u>, 483 U.S. 171, 179-80 (1987); <u>Daou</u>, 411 F.3d at 1022 [court considers "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness," quoting <u>Nursing Home Pension Fund, Local 144 UCFW v. Oracle Corporation</u>, 380 F.3d 1226, (9th Cir. 2004)](<u>Oracle</u>).

The Ninth Circuit has held, with respect to the use of confidential witness accounts to satisfy the PSLRA's standard of particularity, that so long as plaintiffs reveal with particularity the sources of their information, the complaint will survive under the PSLRA, without the necessity of naming them. <u>Daou</u>, 411 F.3d at 1015.

## Discussion

## I.    The Joint Motion to Dismiss

Defendants do not challenge plaintiffs' pleading of the falsity element. The joint motion to dismiss is based on the argument that plaintiffs' *scienter* allegations fail to raise a strong inference that defendants acted deliberately or with reckless indifference. The defendants argue that 1) *scienter* cannot be inferred from the mere fact of a restatement; 2) GAAP

violations do not give rise to a strong inference of *scienter*; 3) the allegation that the defendants must have known the financial statements were false because they received unspecified reports does not lead to an inference of *scienter*; 4) speculation about what the defendants must have known is insufficient to support a strong inference of *scienter*; 5) the mere allegation that the defendants had a "hands on" management style does not raise a strong inference of *scienter*; 6) the signing of the Sarbanes-Oxley certifications by Tsui and Skaggs does not give rise to a strong inference of *scienter*; 7) making false statements in press releases and conference calls about Lattice's future revenue growth and the success of its new products are "forward-looking" statements and, even if inaccurate, do not support a strong inference of *scienter*; and 8) without adequate pleading of *scienter*, pleading motive and opportunity is insufficient, because the alleged motives are simply normal business motives.

## A.  Violations of GAAP

Defendants argue that allegations of a mere failure to follow GAAP do not create a strong inference of *scienter*, citing DSAM, 288 F.3d at 390 ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish *scienter*. ... [S]cienter requires more than a misapplication of accounting principles."); In re Cylink Sec. Litig., 178 F. Supp.2d 1077, 1082 (N.D. Cal. 2001)("allegations

of a failure to follow GAAP, standing alone, do not create a strong inference of *scienter*") and <u>In re Metawave Communications Corp. Securities</u>, 298 F. Supp.2d 1056, 1079-80 (W.D. Wash. 2003)("[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish *scienter*.").

Violations of GAAP standards can provide evidence of *scienter*. <u>Daou</u>, 411 F.3d at 1016, *citing* <u>In re McKesson HBOC Inc. Sec. Litig.</u>, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of *scienter*. After all, books do not cook themselves.") However, plaintiffs must allege enough information so that "a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." <u>Id.</u> at 1017.

Plaintiffs have alleged more than a mere publication of inaccurate accounting figures or a simple failure to follow GAAP. The plaintiffs have pleaded "significant GAAP violations with particularity," <u>Daou</u>, 411 F.3d at 1016, and that they constituted significant inflation of revenue.

Plaintiffs have alleged that defendants manipulated financial statements in the following specific ways: inflating revenues by 6.8% during the Class Period, ¶¶ 4, 40, 59, 83, 103,

prematurely recognizing revenues on products that had been shipped to distributors but never sold to end users, ¶¶ 4, 138-45, thereby also understating deferred income, ¶¶ 59, 83, 103; making improper accounting entries related to deferred income, ¶ 129; artificially maintaining gross margins at about 60% during the first three quarters of 2003, later admitting that gross margins were, at most, 59% in 2Q03, 55% by 3Q03, and 55% by 4Q03, ¶¶ 5, 63-66, 59, 83, 103, 126, 146-53; understating liabilities, ¶¶ 6, 59, 83, 103, 106, 125, 129; understating net loss by 15.5% during the Class Period, ¶¶ 4, 5, 10; reporting deferred income as a single "net" number on the balance sheet, to conceal quarterly changes in deferred revenues and deferred costs to keep its gross margins stable, ¶ 5; and falsely maintaining or inflating share prices, ¶ 9. Plaintiffs allege that the under-reporting of accrued expenses and deferred income enabled Lattice to inflate its revenues and claim that it was maintaining its 60% gross margin, despite the absence of innovation in its CPLD products and its failure to penetrate the FPGA market. Complaint, ¶¶ 2, 40, 51, 75, 103, 126.

Plaintiffs have alleged that the GAAP violations significantly inflated Lattice's revenue: for the first three quarters of FY03, they allege that Lattice's revenues had been inflated by $10.6 million and its earnings per share had been overstated by eight cents. ¶ 4.

The Complaint alleges Lattice's admissions that inappropriate accounting entries were made to restore the deferred income account by offsetting accrued expenses and that the person who made these improper entries was Lattice's controller, defendant Hoyt, ¶ 6; and, through its restatement, that deferred income on sales to distributors and estimated salable inventories at distributors had been misreported, ¶¶ 106, 129. The Complaint also alleges that defendant Skaggs acknowledged in a conference call with investors that Lattice's deferred income account had been "over-depleted" and was "below the level that was required to support the inventory on our distributors' shelves," ¶ 5.

Plaintiffs have alleged that Lattice acknowledged that its own lack of adequate internal and disclosure controls permitted Hoyt to make manual journal entries that reversed accrued charges in order to manipulate Lattice's deferred income. Lattice's acknowledgment contradicted the three Sarbanes-Oxley certifications that defendants Tsui and Skaggs signed, in which they personally vouched for the adequacy of Lattice's internal and disclosure controls and represented that Lattice had designed the controls specifically "to ensure that material information relating to Lattice is made known to us by others before quarterly financial information was published", ¶ 7.

The Complaint also provides information from individuals

about how and why the improper journal entries came to be made. These individuals include CW 8, the former manager in Lattice's finance department, who related that financial information was adjusted to "stay with the trend" rather than reflect actual facts reported, ¶ 39; and CW 2, a former Lattice regional sales manager, who stated that during FY03, Lattice's distributors had been encouraged to purchase more inventory than normal, and that Lattice then refused to accept returns of excess inventory, Complaint, ¶ 45.

Plaintiffs have also alleged, through CW 1, 7 and 8, circumstantial evidence that Hoyt made the improper journal entries with the knowledge of at least some of the individual defendants, and that although Hoyt purportedly resigned, he was immediately rehired. Complaint, ¶ 48.

**B.    Access to information**

Defendants contend that general allegations of defendants' "hands-on" management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient to lead to a strong inference of *scienter*. <u>Daou</u>, 411 F.3d at 1022.

Plaintiffs argue that they have alleged facts supporting a strong inference of actual knowledge by defendant Hoyt, Lattice's Controller, who has been acknowledged as the person who made the

improper journal entries overstating revenue. They contend that circumstantial allegations against the other defendants support a strong inference of *scienter*.

For allegations based on the defendants' regular receipt of financial, sales, marketing, and other business reports to create a strong inference of *scienter*, plaintiff must provide such "adequate corroborating details," as who drafted the reports, who received them, an "adequate description of their contents," and from whom the plaintiffs obtained information about them. *See* <u>Silicon Graphics</u>, 183 F.3d at 985; <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1087 (9th Cir. 2002); <u>In re Nike, Inc. Sec. Litig.</u>, 181 F. Supp.2d 1160, 1168 (D. Or. 2002).

Plaintiffs have alleged through CW 8 that financial review meetings were held on a monthly and quarterly basis and were attended by Tsui, Skaggs, Sloss and Hoyt. Complaint, ¶ 187. Hoyt and Sloss also had frequent one-on-one meetings to discuss financial matters. <u>Id.</u> Lattice held "pre-closing" and "closing" meetings in connection with the preparation of earnings press releases, which were attended by Tsui, Skaggs, Sloss, and Hoyt. <u>Id.</u> Tsui's daughter was a Lattice accountant. <u>Id.</u>

Plaintiffs allege through CW 8 that Lattice generated not only regular financial reports but also "lots of internal and custom spreadsheets," including reports on Lattice's gross margin, and summaries of all journal entries, which would have

reflected the balance sheet changes made by Hoyt. Complaint, ¶ 188. Id.

CW 8 has said that Tsui received both standard and custom reports on a daily and weekly basis, and that a package of financial reports was regularly provided to Tsui, Sloss, Skaggs and Laub. Id.

Plaintiffs allege through CW 4, who worked in Lattice's sales department until late 2003, in close proximity to the offices of Tsui and other top executives, that Tsui, Laub, Skaggs and other executives received regular weekly sales and other reports on the status of Lattice's business. Complaint, ¶ 189. CW 4 and CW 7 have said that weekly sales and other reports were delivered to Tsui every Monday, even on holidays, and covered all aspects of the company's business. CW 4 has said that similar quarterly reports were also prepared. Id.

According to CW 4, many of the weekly and quarterly reports were based on databases Lattice maintained so that upper management could track all of Lattice's products. Complaint, ¶ 190. CW 7 has said that Lattice also maintained an internal website available to all employees that contained detailed information on Lattice's sales, with differing levels of access and detail provided depending on the level of the employee in the organization. Id. These databases included sales data provided by the finance department and design information provided by the

marketing department. The databases, including those referred to as "Design Tracker" and "CSS," were specifically designed to track the status of new product development efforts, including FPGA and new CPLD products. Id. By reviewing the databases and the reports, Lattice's senior management, including Tsui, Laub and Skaggs, were kept aware of the level of success being achieved by Lattice's new products. Id.

I conclude that these allegations show that the defendants had access to information about the company's business success and to information about the company's financial data, which, in combination with the Sarbanes-Oxley certifications and other allegations discussed below, provide "adequate corroborating details," sufficient to create an inference of *scienter*.

## C. False statements

Defendants argue that the plaintiffs have pleaded only conclusory allegations that the defendants must have known the financial statements were improper, and that such conclusory allegations are insufficient to satisfy the heightened pleading requirements for *scienter*. They rely primarily on <u>Vantive</u>, 283 F.3d at 1079 and <u>In re Read-Rite Corp.</u>, 335 F.3d 843 (9th Cir. 2003).

In <u>Vantive</u>, the court held that allegations of false forecasts of future revenues, misleading statements about the quality of the company's products and its ability to sell them,

and speculation "in hindsight" that previous projections must have been false, did not meet the requirements of the PSLRA because most of the allegedly misleading statements were "generic, subjective, difficult to prove or refute, and could be alleged against almost any company that has experienced a drop in sales revenue." 253 F.3d at 432. In Read-Rite, plaintiffs relied upon post-class-period admissions which allegedly indicated defendants' contemporaneous knowledge. 335 F.3d at 846. The court acknowledged that it was "clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." 335 F.3d at 846.

However, the Read-Rite court also noted that allegations of specific contemporaneous conditions that "demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made," 335 F.3d at 846, along with a later statement which "directly contradicts or is inconsistent with the earlier statement," are sufficient to create a strong inference of scienter. Id.

I conclude that plaintiffs in this case have alleged facts which create a strong inference that defendants had contemporaneous knowledge of the falsity of their statements, because they have alleged both contemporaneous business conditions which demonstrated that falsity and later statements which directly contradict earlier statements.

Contemporaneous business conditions include falling revenues, ¶ 92; disproportionately high R & D expenses, declining market share, ¶¶ 36, 92; lack of acceptance of Lattice's FPGA products, ¶¶ 32, 34; lowered demand, diminishing prices, and declining sales in core CPLD and SPLD products, ¶¶ 33, 35; these conditions demonstrate the falsity of defendants' claims that "our CPLD revenues grew nicely," ¶ 51; that Lattice was "quite bullish with respect to FPGA revenues," ¶ 71, and was receiving good feedback from customers in the FPGA area, id.; that new product sales "grew rapidly on a sequential basis, ¶ 89; that FPGA sales were expected to increase, ¶ 90; and that CPLD sales were expected to grow, ¶ 90.

In Oracle, the court held that Oracle's forecasts about the third quarter created a strong inference of *scienter* because contemporaneous reports and data, available to the party making the forecasts, contradicted that statement; the reports and data included an internal database with global information about sales. 380 F.3d at 1230. Similar facts have been alleged here.

Defendants argue that statements made by Tsui, Laub and others at press conferences were merely "forward-looking statements" that are safe from liability under the PSLRA. A forward-looking statement is one which projects revenues, income, or earnings per share; management's plans or objectives for the future; and predictions of future economic performance. 15 U.S.C.

§ 78u-5(i)(1)(A)-(C). In addition, any statement of the "assumptions underlying or relating to" such statements constitutes a forward-looking statement. Id. 78u-5(i)(1)(D). Under the PSLRA's "safe harbor" provisions, plaintiffs must prove that "forward-looking" statements were made with "actual knowledge" that they were false or misleading. Daou, 411 F.3d at 1021.

I am unpersuaded that plaintiffs have alleged nothing more than generic, subjective statements that proved to be wrong in hindsight, and I reject the argument that defendants were merely making forward-looking statements. I find the defendants' statements more akin to those found actionable in Ronconi, 253 F.3d at 430-31, where the court noted that a statement that "sales growth was accelerating," was "material and descriptive of historical fact, rather than forward looking."

### D. The Sarbanes-Oxley certifications

Plaintiffs contend that the Sarbanes-Oxley certifications provide an inference of at least deliberate recklessness on the part of Tsui and Skaggs. In the certifications, the two attested to the SEC that they had reviewed Lattice's Form 10-Q reports and that, based on their knowledge, none of the information presented in those reports was false or misleading; that they were each responsible for establishing and maintaining Lattice's disclosure

controls and procedures;[3] that 1) they had designed controls and procedures to ensure that material information is "made known to us by others" within Lattice during the period covered by the report; 2) they had personally evaluated the effectiveness of those controls within the last 90 days; and 3) any deficiencies in those controls and procedures had been disclosed in the 10-Q report, as well as to Lattice's outside auditors and internal audit committee. Complaint, ¶¶ 56, 80, 100.

Defendants argue that signing Sarbanes-Oxley certifications does not raise a strong inference that Tsui and Skaggs made false statements intentionally or with deliberate recklessness, because "Sarbanes-Oxley Act certifications are required of every chief executive officer and every chief financial officer of publicly traded companies, without exception." Defendants' Memorandum, p. 12, *citing* 18 U.S.C. § 1350; 17 CFR §§ 240.13a-14; 17 CFR § 240.15d-14. Defendants argue that if "these certifications raised a strong inference of *scienter*, every corporate officer who

---

[3] The Sarbanes-Oxley Act provides the following definition of disclosure controls and procedures:

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.

SEC Rule 13a-15(e), 17 C.F.R. § 240.13a-15(e), 17 C.F.R. § 240.15d-15(e).

signed a certification for a Form 10-Q or 10-K filing that was later found to be incorrect would be subject to a securities fraud action." <u>Id.</u> Defendants assert that allegations that Tsui and Skaggs certified Form 10-Qs "raises no inference of *scienter* and should be disregarded." <u>Id.</u>

I do not find this argument persuasive. "When a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." <u>Howard v. Everex Systems, Inc.</u>, 228 F.3d 1057, 1061 (9th Cir. 2000). Plaintiffs have alleged that Tsui and Skaggs certified for each quarter of 2003 that Lattice had internal controls in place and functioning, that they were personally responsible for establishing and maintaining those controls, and that they had personally evaluated the effectiveness of those controls. Nevertheless, Lattice acknowledged that the March 2004 restatement was necessitated by "deficiencies in the design and operation of Lattice's internal controls related to the deferred income account," Complaint, ¶¶ 124-25, 129, that existed at the same time Tsui and Skaggs signed the Sarbanes-Oxley certifications. Lattice now admits that its chief financial officer overrode the internal controls to make incorrect and misleading journal entries; this further underscores the contradiction between the facts and the Sarbanes-Oxley

certifications.

As plaintiffs point out, the notion that Tsui and Skaggs' Sarbanes-Oxley certifications should be disregarded merely because every CEO and CFO is required to sign one, "suggests that Tsui and Skaggs treated the Sarbanes-Oxley requirements as mere boilerplate;" plaintiffs assert that defendants' argument indicates a "fundamental misunderstanding of the purpose and requirements of the Act, which was adopted in response to the unprecedented accounting frauds ... that had been perpetrated in the wake of the adoption of the PSLRA." Plaintiffs' Memorandum, page 15. Plaintiffs argue that the Sarbanes-Oxley certification requirements were expressly intended to prevent top executives from using a "head in the sand" defense to actions for securities fraud committed on their watch, id., citing to a statement by the SEC, warning corporate officers that a "false certification potentially could be subject to ... both Commission and private actions for violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5." Sec. Act Release No. 8124, Pt. II.B.6 (August 29, 2002), 2002 WL 31720215.

Plaintiffs also point to a telling difference in the Sarbanes-Oxley certifications Tsui and Skaggs signed for 3Q03. These certifications *omit* a paragraph certifying that "all significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the

date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses" have been disclosed. Plaintiffs argue that the omission of this paragraph–– which appeared in the certifications for 1Q03 and 2Q03–– supports the inference that, by the third quarter at least, Tsui and Skaggs were aware of internal control problems which had not been disclosed to investors.

I conclude that the Sarbanes-Oxley certifications give rise to an inference of *scienter* because they provide evidence either that defendants knew about the improper journal entries and unreported sales credits that led to the over-reporting of revenues (because of the internal controls they said existed) or, alternatively, knew that the controls they attested to were inadequate (because Hoyt had made unauthorized or improper entries that overrode the internal controls). The Sarbanes-Oxley certifications, in combination with plaintiffs' allegations of regular finance meetings, extensive access to databases, periodic reports and special reports, and the allegations that they were micromanagers, are sufficient to create a strong inference of actual knowledge or of deliberate recklessness. The inference is further strengthened by allegations of business reverses which would create a motive for overstating revenue; the magnitude of the GAAP violations; the statements of confidential witnesses that Hoyt would not have manually overridden accounting entries

without authorization from upper management; and the defendants'
apparent ratification of Hoyt's actions by reemploying Hoyt after
his purported termination.

Defendants' supplemental authority, <u>Higginbotham v. Baxter
International, Inc.</u>, 2005 WL 1272271 (N.D. Ill. May 25, 2005),
submitted after oral argument, does not affect my conclusion.

### E. Motive

Defendants assert that the mere pleading of motive and
opportunity (i.e., that defendants were motivated to artificially
inflate Lattice's stock price to avoid a goodwill write-off,
Complaint, ¶¶ 8, 30, 68(g), 74(d), 88(i), 93(d), 108(i), 116(d);
maximize their bonuses, Complaint, ¶¶ 172-73; keep newly issued
options "above water," Complaint, ¶¶ 8, 29, 68(g), 74(d), 88(i),
93(d), 108(j), 116(d), 162-71; and raise capital to retire higher
interest debt (Complaint, ¶¶ 9, 68(h), 74(d), 88(j), 93(d),
108(k), 116(d), 175-77) is insufficient to withstand dismissal.
Defendants rely on <u>Silicon Graphics</u>, in which the court held that
"facts showing ... a motive to commit fraud and opportunity to do
so may provide some reasonable inference of intent, [but] they
are not sufficient to establish a *strong* inference of deliberate
recklessness," 183 F.3d at 974 (emphasis in original) and on
<u>Lipton v. Pathogenesis Corp.</u>, 284 F.3d 1027, 1038 (9th Cir. 2002)
("If *scienter* could be pleaded merely by alleging that officers
and directors possess motive and opportunity to enhance a

company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities actions.") Defendants argue that many of these alleged motives–– keeping the stock price high, raising capital, increasing the value of stock options and other executive incentives–– are normal goals of every business.

While plaintiffs' allegations, without more, would be insufficient to withstand a motion to dismiss on *scienter* grounds, the motives alleged by the plaintiffs, when viewed in the totality of all the other allegations, add additional weight to the inference of *scienter*.

**F.  Liability of each defendant**

Defendants argue that the allegations against each of the individual defendants are insufficient to establish *scienter*.

Plaintiffs counter that the group-published information presumption, which is followed by the Ninth Circuit, holds that false or misleading company publications are reasonably presumed to be the collective action of each of the company's actions. *See* Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987):

> In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group published information," it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity

> requirement of Rule 9(b) by pleading the
> misrepresentations with particularity and where
> possible the roles of the individual defendants in
> the misrepresentations.

Defendants assert that the viability of the group-publication doctrine has been questioned since the enactment of the PSLRA, in the Fifth Circuit, in Southland Securities v. Inspire Ins. Solutions, 365 F.3d 353, 365 (5th Cir. 2004), and by two district courts in California. *See, e.g.*, In re Lockheed Martin Corp. Securities Litigation, 272 F. Supp.2d 928, 934-36 (C.D. Cal. 2002); Allison v. Brooktree Corp., 999 F. Supp. 1342, 1350-51 (S.D. Cal. 1998). However, the Northern District of California, in In re Secure Computing Corp. Securities Litigation, 120 F. Supp.2d 810, 821-22 (N.D. Cal. 2000) declined to abolish the group-published information presumption because "no Ninth Circuit case has so held."

I also decline to abolish the group-published information presumption in the absence of authority from the Court of Appeals. However, even in the absence of the group-published information presumption, I conclude that plaintiffs' allegations against Tsui, Skaggs, and Laub are sufficient to create a strong inference of *scienter*.

In conclusion, when the allegations of the Complaint are considered in their totality, plaintiffs have pleaded *scienter* with the particularity required by the PSLRA. The Complaint

alleges specific information about significant revenue inflation through a variety of admitted GAAP violations. The Complaint alleges motive and opportunity on the part of the defendants to commit fraud. The Complaint alleges that the individual defendants had access to substantial contemporaneous information which should have alerted them to the accounting improprieties, and that they had a "hands-on" management style. The Complaint alleges that Tsui and Skaggs signed Sarbanes-Oxley certifications representing that none of the information presented in the Form 10-Q reports was false or misleading, and that they had designed controls and procedures to ensure that material information was made known to them. The Complaint alleges, through a confidential witness, that Hoyt would not have overridden the company's internal controls without authorization from upper management, and that after admitting Hoyt had made improper journal entries, the company apparently ratified Hoyt's conduct by reinstating him after his purported termination. While any of these allegations standing alone would not necessarily demonstrate *scienter*, the combination of these allegations with the Complaint's "specific allegations of deliberate accounting misfeasance" create a strong inference of *scienter. See* <u>Daou</u>, 411 F.3d at 1024. The Complaint contains "sufficient 'particularity' and 'incriminating facts' to distinguish the allegations from the countless 'fishing expeditions' which the PSLRA was designed to deter." <u>Id.</u>

**II.   Hoyt's Motion to Dismiss**

Hoyt's motion is based on the contention that plaintiffs have not stated a claim Section 10(b) claim against him and, because the § 20(a) claim is a derivative one which can only arise from a violation of § 10(b) or a Rule 10b-5 violation, they necessarily have failed to state a § 20(a) claim.

Hoyt contends that plaintiffs' "generalized and conclusory" allegations fail to establish that Hoyt acted with *scienter*, because at most they have alleged that he made journal entries to "correct accounts identified as inaccurate based on contemporary information and documentation" which were "later discovered to be in error." Hoyt cites the holdings of  DSAM and Worlds of Wonder that the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, do not establish *scienter*. For the reasons discussed above, this argument is unpersuasive.

Hoyt also argues that plaintiffs have not alleged facts showing that Hoyt exercised "control" over primary violators of Section 10(b). To prove a prima facie case under § 20(a) of the Act, 15 U.S.C. § 78t(a),  plaintiff must establish 1) a primary violation of federal securities law and 2) that the defendant exercised actual power or control over the primary violator. America West, 320 F.3d at 945.

To state a claim for "controlling person" liability, plaintiffs must plead particular facts showing that Hoyt

possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Lattice itself or of any other person. In fact, plaintiffs have alleged that Hoyt was a "yes man" who "had no significant level of authority and could not do anything without the approval of Tsui or Skaggs," Complaint, ¶ 49. I agree that plaintiffs have not alleged facts showing that Hoyt possessed the power to direct or cause the direction of the management and policies of Lattice. The § 20(a) claim against him is dismissed.

## Conclusion

Defendants' joint motion to dismiss the Consolidated Complaint (doc. # 39) is DENIED. Defendant Hoyt's motion to dismiss (doc. # 42) is DENIED with respect to his § 10(b) liability, and GRANTED with respect to his § 20(a) controlling person liability. Defendants' Motion for Leave to File Supplemental Memorandum (doc. # 64) is GRANTED.

IT IS SO ORDERED.

Dated this  3  day of  January , 2006.


             /s/ Ann Aiken
               Ann Aiken
      United States District Judge